James A. JACKSON, Jr.

v.

**OMI COURIER TRANSPORT, INC.**

No. G–98–265.

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 10, 2000.

Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, for James A. Jackson, Jr., plaintiff.

Jad J. Stepp, Stepp von Sternberg and Sullivan, Houston, TX, Dennis John Sullivan, Stepp von Sternberg and Sullivan, Houston, TX, for OMI Corporation, defendant.

Chris Andrew Lorenzen, Crain Caton and James, Houston, TX, for OMI Courier Transport, Incorporated, defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

The above cause came on for a non-jury trial commencing on June 28, 1999, the Honorable Samuel B. Kent presiding. The Court, having carefully considered the oral testimony of all witnesses presented live at trial, the deposition transcript of each witness proffered in that format, all exhibits tendered during the trial, all pleadings, particularly the Joint Pre–Trial Order, and all relevant attachments, as offered through their respective counsel, and the Proposed Findings of Fact and Conclusions of Law, and extensive Post–Trial Briefs submitted by each of the stated parties, and on the basis of a preponderance of the evidence, and applicable law, and pursuant to Rule 52(a) of the Federal

Rules of Civil Procedure, hereby enters its Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. This is a Jones Act and general maritime law action filed by James A. Jackson, Jr., (hereinafter referred to as "James Jackson"), the Chief Steward of the M/V OMI COURIER, for the alleged negligence of the Defendant, OMI COURIER TRANSPORT, INC., (hereinafter referred to as "OMI"), and the unseaworthiness of the M/V OMI COURIER. Plaintiff initially sued OMI Corp. Defendant answered on behalf of OMI Courier Transport, Inc. as the owner, operator and employer stating that "OMI Corp." was a misnomer. Plaintiff subsequently amended his Complaint to add OMI Courier Transport, Inc. as a Defendant. OMI Corp. Has previously been eliminated as a Defendant. Mr. Jackson alleged that as a result of OMI's negligence and the unseaworthiness of the M/V OMI COURIER, he sustained a low back injury when he fell on the ship on March 3, 1998. Mr. Jackson contends he was not contributorily negligent given the facts and circumstances surrounding his accident.

2. Defendant does not deny that Plaintiff fell aboard its vessel while in the course and scope of his employment, but Defendant contends that the fall was due to the negligence of James Jackson and that any injuries sustained by him were as a result of his own negligence and/or preexisted the incident at issue.

3. On March 3, 1998, James Jackson was a seaman employed by OMI Courier Transport, Inc. and assigned to the vessel Courier which was owned and operated by OMI Courier Transport, Inc. His maritime status is uncontested.

4. The Court finds that this matter is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1331, et seq. The Court also finds that it has jurisdiction over all the parties and that proper venue for this suit is in this District and before this Court. Neither jurisdiction nor venue was contested.

5. James Jackson joined the OMI COURIER in Houston, Texas on February 27, 1998, as Chief Steward for the voyage to Mobile, Alabama, where the vessel was going to lay up. Mr. Jackson completed the eighth grade and entered the Merchant Marine on September 1, 1963, at age 17. Since that time, he has always sailed in the Steward's Department. All told, Mr. Jackson had approximately 35 years seagoing experience. Accordingly, the Court finds that as of March 3, 1998, Mr. Jackson had substantial experience working in the capacity of Chief Steward aboard numerous vessels, although he had no prior experience aboard the instant vessel and was unfamiliar with the area in which he fell.

6. Mr. Jackson was told by the Captain at approximately 11:20 a.m., on March 3, 1998, to finish securing the "meat box", an area of food storage in the vessel's galley. This presented a problem as Mr. Jackson, who was ultimately responsible for everything in the Steward's Department, had already become aware during the short voyage that the Cook needed close supervision and assistance to properly prepare certain menu items and that lunch was due to be served in 10 minutes. Plaintiff could not provide this supervision and comply with the Captain's orders simultaneously, so he sought out the Bosun to intervene on his behalf, as was proper. He spied the Bosun on the main weather deck and, heading toward him, attempted to pass through the starboard side door of the weather bulkhead (hereinafter "the door"). The Bosun was involved in butterworthing (tank cleaning) operations. None of the foregoing was controverted by the Defendant and the Court so finds.

7. The door is a non-watertight 36″ × 60½″ opening with a coaming that is 17¾″ high at the midpoint of the door. The purpose of the coaming is to prevent water from flooding into the accommodation area of the vessel. U.S. Coast Guard regulations

require that coamings for doors of this type be not less than fifteen inches high. The testimony of Defendant's liability expert, Mr. Penn Johnson, established that coamings for doors of this type are commonly eighteen inches high, although not required.

8. Mr. Jackson claims that as he was attempting to pass through the door, he began to lose his balance as a result of having to step in an exaggerated way over a 10″ wide (or deep) stiffening member that ran parallel to the bottom of the door opening about seven inches below the same on the aft side of the weather bulkhead. Simultaneously, his leading foot began to slip on something on the weather deck, either hoses, lines or overspray, all of which were incident to the butterworthing operations in progress. Mr. Jackson's trailing foot then hung up on the 17¾″ high coaming of the weather bulkhead and he lost his grip on the bulkhead. He then fell to the deck and injured his back. While the Defendant does not dispute that Mr. Jackson fell, its claims that he merely tripped over the door coaming, that while the deck in the area may well have been wet with water overspray from butterworthing, no hoses or lines were closer than 10 feet to the door, and that the door and surrounding area and appurtenances were seaworthy. With regard to these disputed matters, the preponderance of the evidence supports and the Court finds (and will hereinafter conclude) that Mr. Jackson's fall was the result of Defendant's negligence, in failing to provide a safe place to work and the unseaworthiness of the vessel as described below.

9. The key testimony offered to dispute Mr. Jackson's version of the fall was that of Chief Mate Martin Crowell, who was both at the time of the accident and as of trial the permanent Chief Mate of the vessel. He testified that Mr. Jackson tripped by simply catching the toe of his trailing foot by an inch or two on the top of the coaming. Having carefully observed both witnesses testify in person, the Court finds Mr. Jackson's testimony more credible. Moreover, there is evidence in the form of deposition testimony and Defendant's official reports offered and entered into evidence that the Mate was not even present when Mr. Jackson fell or if he was, that he did not actually witness the accident. The Chief Mate testified he was on the main deck along with Bosun DePalma and Chief Pump-man Rick Parker and witnessed Jackson's fall. However, the OMI report signed by Mr. Parker indicates: "with the following people: None." Mr. Parker, contrary to this report, testified on deposition that he was in fact with Chief Mate Crowell at the time, but that Crowell did not witness the accident because he had his back turned. Mr. DePalma's report indicates he was in the company of Day-man McGuire. In Bosun DePalma's deposition, he admits giving a statement to Jackson's investigator that at the time of the fall the Mate was down in one of the cargo tanks with the Captain. Finally, Mr. Crowell himself testified that OMI procedure requires everyone who witnessed the accident to fill out a report and everyone who was on duty to fill out a report indicating whether they were a witness. In spite of such procedures and to the detriment of his credibility, Mr. Crowell did neither.

10. Regarding the seaworthiness of the door and its appurtenances and the surrounding area, Defendant called Mr. Penn Johnson as an expert in the area of marine design. The Court recognized him as an expert in the proffered area pursuant to Rule F.R.E. 702. He had inspected the vessel and made a number of measurements. He testified the door opening is 5′ ½″ high by three feet wide and the bottom of the opening (and conversely the height of the coaming) is 17¾″ from the deck at the center point, 11″ at the outboard point and 16½″ at the inboard point. The stiffening member parallel to the bottom of the door opening (i.e., the top of the coaming) is 10′ deep or wide and located approximately 11″ off the deck and 7¾″ below the bottom of the door opening (top of the coaming). Expert Johnson admitted that it was clearly anticipated this stiffener

would be used as a step, but in spite of this foreseeable use, it was not designed as a step and anyone who used it as a step up would have to simultaneously duck down to avoid hitting their head on the top of the doorway unless they were under 5′ 8″ tall. Of critical importance to the Court, there is no hand hold at the door and Expert Johnson further testified that the transiting of the doorway required, at a minimum, the precaution of holding onto the side of the door opening or one of the parallel stiffening members which run alongside the height of the door and are also 10″ wide or deep. The uncontroverted evidence is that Mr. Jackson attempted to do precisely this with dangerous and foreseeable results. Mr. Jackson testified he would have used a hand hold if one had been installed, which he said would probably have allowed him to prevent the fall, and the Court so finds. Such a hand hold could have been easily installed at nominal expense. The Court further finds the lack of a hand hold to constitute negligence in failing to provide a safe place to work and that such defect rendered the vessel unseaworthy.

11. Expert Johnson agreed that a hand hold could indeed have been installed and admitted that for everyone passing through the door that did not use the lower member as a step, such member constituted an additional 11″ by 11″ obstacle to the 17¾ high coaming. The crew members who testified, either in person or by deposition, were unanimous that they do not use this member as a step. The deck, both fore and aft of the doorway, is steeply cambered from inboard to outboard so that, in passing through, one is stepping to and from uneven surfaces. If one uses the lower member as a step, when passing aft to forward one must step from a higher flat surface onto a lower cambered surface. Additionally, the weather deck is likely to be wet and the evidence showed it was wet at the time of its accident and the Court so finds. Expert Johnson referred to U.S. Coast Guard regulations requiring coamings to be not less than 15″ high, but there is no require-

ment that they be as high as 17 ¾″ and Expert Johnson admitted there was no reason it needed to be that high. Neither the edge of the doorway, which is flat ¾″ thick steel nor the parallel members, which measurements showed extend some 11″ behind the doorway when passing aft to forward, can function as seaworthy hand holds, and yet, as Expert Johnson states and the Court finds, using a hand to maintain balance is the minimum required precautionary measure when passing through the door. Even if the configuration and dimensions of the door and the surrounding area and appurtenances is unavoidable, the lack of a hand hold is not unavoidable and the Court finds such lack to constitute unseaworthiness, and negligence in failing to provide a safe place to work as well as a legal and proximate cause of at least part of Plaintiff's fall, injuries, and consequent damages.

12. Still, Plaintiff bears responsibility for his own safety and while new to this vessel, his extensive maritime experience justifies this view. Consequently, the Court finds the Defendant and the vessel 50% liable and Plaintiff 50% liable for Plaintiff's stated losses, except cure expenses which are solely to be borne by Defendant..

13. Dr. David Baskin, the Defendant's IME doctor, recognized as an expert by the Court under F.R.E.Rule 702, stated every disk in Mr. Jackson's lumbar spine was degenerated predating the accident, but he did admit Mr. Jackson could have sustained a soft tissue injury to his back in the fall described. Dr. Baskin also admitted that he has seen cases where degenerative changes in the back which are asymptomatic become symptomatic after an aggravating trauma or injury and he agrees trauma can cause degenerative changes to become symptomatic.

14. Dr. Thomas Taylor, recognized by the Court as an expert under F.R.E.Rule 702, who saw Mr. Jackson on March 6, 1998, just several days after his fall, did believe Mr. Jackson had suffered an injury to his low back, specifically a lumbar muscle

strain. He also stated it could take several days, or longer, for a herniated disc to manifest itself with symptoms.

15. Defendant vigorously argues that as Mr. Jackson passed his SIU physical on April 28, 1998 and reported at that time he had no "injuries, surgeries or broken bones" since his last physical of April 1997, he was not injured in the fall of March 3, 1998 or was alternatively fully recovered from any injuries by April 28, 1998. The Court finds this argument reasonable, but ultimately unpersuasive. Mr. Jackson's undisputed testimony was that he filled out the physical questionnaire the same way every year if he felt himself fit for duty. He routinely answered "no" to questions about prior accidents and injuries on his SIU physicals, even though he freely admitted he had three prior back injuries, one on an ammunition ship in Viet Nam in the 1960's, one in the 1970's and one in approximately 1983. These SIU physicals are conducted by nurse practitioners and physicians' assistants rather than by M.D.'s. Of note, Mr. Jackson was not receiving any maintenance at the time. The Court also notes that at his next visit to Dr. Zoran Cupic after the physical, on June 1, 1998, he requested and obtained a release to attempt to return to work. By the time a job became available, however, his back pain deteriorated and he began to experience pain in his legs, so that he did not, in fact, return to work. Being subsequently advised by Dr. Cupic that surgery was probably necessary to correct his back problem, Mr. Jackson sought the opinion of Dr. James Ghadially.

16. Dr. James A. Ghadially, recognized by the Court as an expert under F.R.E.Rule 702, was the Plaintiff's treating physician at the time of trial. He opined that in reasonable medical probability the fall on or about March 3, 1998 aggravated Mr. Jackson's pre-existing back condition and brought on a new complaint: leg pain, caused by protrusions through torn annulus at the L4–5 and L5–S1 levels, with nerve root compression at both levels as shown on the MRI scan of October 6, 1998. Dr. Ghadially further opined that absent the fall aboard ship or some other aggravating accident, Mr. Jackson would not need surgery on his back. Because of the fall, however, the Court finds that Mr. Jackson will need a simple decompression of the two nerve roots, the costs for which in the Houston area are as follows: Surgery—$25,000.00; Post-surgical physical therapy and medications $5,000 – $6,000.00; long term post-operative care, including follow-up visits, x-rays, medication $1,500 – 2,000.00 per year off and on for life. Mr. Jackson testified he would have the surgery if it was paid for. Whether Mr. Jackson has surgery or not, Dr. Ghadially testified he should be restricted to sedentary to light duty for life as a result of the fall and the Court so finds.

17. The parties stipulated that if Dr. Ghadially were called to testify on Mr. Jackson's outstanding medical bills, he would testify that being familiar with the charges for such services, his own outstanding bill of $2,593.34, which includes charges from Gulf Coast Pharmacy and Dr. Cupic's outstanding bill of $4,411.00, Premier Physical Therapy's outstanding bill of $75.00, and Dr. Anh Kim Luu's outstanding bill of $500.00, are reasonable and necessary expenses for medical cure incurred by James Jackson and were necessary as a result of his fall aboard the OMI COURIER on March 3, 1998. In view of this stipulation and the totality of the evidence, the Court agrees and so finds and concludes that Plaintiff should be awarded such amounts as cure, such being unmitigated by any contributory negligence.

18. The Court is not persuaded that the surgical back condition with which Mr. Jackson is now faced is the result solely of pre-existing injuries, conditions and/or accidents. The evidence is undisputed that Mr. Jackson returned from each of his three prior back injuries to full duty without limitation earning an average of approximately $35,000.00 per year gross in the four full calendar years prior to the accident in issue. Viewing the totality of

the medical and work history evidence, the Court finds and concludes that, in reasonable medical and legal probability, Mr. Jackson will have to undergo the surgery and follow-up care described by Dr. Ghadially and incur the charges for the same as the legal and proximate result of his fall aboard the COURIER which, in turn, the Court finds and concludes was 50% legally and proximately caused by the Defendant's negligence, in failing to provide a safe place to work and the unseaworthiness of the vessel. The Court finds that 50% of Plaintiff's back problems predates his stated injury.

19. The Court recognized Dr. Ken McCoin, Plaintiff's economist, as an expert in evaluation of economic loss pursuant to F.R.E.Rule 702. The Court finds, based upon the testimony of Dr. McCoin, using the standards of *Culver II* and its progeny and the evidence before the Court, that Plaintiff has sustained past and future economic losses, inclusive of lost wages and fringe benefits.

20. Dr. McCoin testified that Plaintiff has a work life expectancy of 11.46 years, and a life expectancy of 24.6 years as of the date of trial, based on U.S. Government Life Tables. Dr. McCoin further testified that Plaintiff had averaged $35,512 in wages during the years 1995, 1996 and 1997, expressed in 1997 dollars, deducting for Social Security payments, and relevant income taxes. To calculate future losses, he used a below market discount rate of one and one-half percent below average, as required by *Culver II*. He calculated that Plaintiff sustained in past lost wages $40,059.00, as of the time of trial. Dr. McCoin also testified that Plaintiff will suffer future economic losses totaling $305,527.00, assuming he started working on January 1, 2000, at a $6.00 per hour job. But, this figure includes an untenable $17,914.00 in lost household services, and somewhat overstates Plaintiffs economic loss. Instead, the Court finds total, past and future economic losses of $225,000.00 and the Court finds and concludes that Plaintiff has sustained such losses, past and future, as a legal and proximate result of OMI's negligence and the unseaworthiness of the vessel.

21. The Defendant's' retained economist, Dr. Yeager, who was also recognized by the Court as an expert under F.R.E.Rule 702, did not agree that including unemployment benefits in lost wage calculations was appropriate. Nonetheless, he calculated an average gross taxable income based on Plaintiff's 1994 through 1997 tax returns of $34,479.00 expressed in 1998 dollars. Dr. McCoin testified that where a plaintiff routinely had to resort to unemployment compensation because of the undisputed contractual limitations in the number of days per year a seaman may work per union contract, it is probably appropriate to include such benefits in economic loss calculations. Under the particular evidence, facts and circumstances of this case, the Court agrees and so finds and concludes. The Court further notes that Mr. Jackson reported and paid taxes on this unemployment compensation income.

22. The Court finds that Defendant's retained economist, Dr. Yeager, did not properly estimate the lost benefits and the insurance coverage when he considered the total economic loss of Plaintiff. Still, the Court believes the proper measure of Plaintiff's economic losses lies in the area between that opined by the respective retained economists, which, again, the Court calculates at $225,000.00.

23. Based on the totality of evidence in this case, the Court further finds that the Plaintiff has sustained the following losses by a preponderance of the evidence, in addition to past and future wage related losses found above, for which OMI, as owner, operator and employer of the crew of the OMI COURIER, is liable:

a. for the physical pain and mental anguish and suffering sustained by James Jackson from his injuries on March 3, 1998 and through the time of trial, the amount of $25,000.00.

b. for the physical pain and mental anguish and suffering sustained by James Jackson from his injuries on March 3, 1998 and through the end of his life expectancy of 24.6 years at the time of trial, the amount of $150,000.00.

c. past unpaid cure in the amount of $7,579.34; and

d. future medical in the amount of $40,100.00, or one-half the amount opined by Dr. Ghadially, of $80,200.00.

All of these findings, except (c), are subject to proportionate reduction for contributory negligence.

24. Under maritime law, the awarding of pre-judgment interest is the rule rather than the exception, and, in practice, well-nigh automatic. *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1028 (5th Cir.1986). This rule applies equally to Jones Act claims brought under the Court's admiralty jurisdiction. *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 490 (5th Cir.1985). A Trial Court only has the discretion to deny prejudgment interest where the peculiar circumstances would make such an award inequitable. *Id., citing Inland Oil & Transport,* 696 F.2d at 327. In this Circuit, prejudgment interest is usually awarded to the date of loss to ensure that the injured Plaintiff is compensated for the use of funds to which the Plaintiff was entitled, but which the defendant had use of prior to Judgment. *Reeled Tubing, Inc.,* 794 F.2d at 1028.

25. The Court also has broad discretion in setting the rate of prejudgment interest. *Reeled Tubing, Inc.,* 794 F.2d at 1029. In setting the rate of prejudgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *Reeled Tubing, Inc.,* 794 F.2d at 1029. The Fifth Circuit has previously approved, taking into account the equities involved, application of the rate prevailing under 28 U.S.C. § 1961 at the time the loss occurred, in this case March 3, 1998. *Id.* Taking judicial notice of the prevailing rate for February 26, 1998, less than a week before the accident of March 3, 1998, the Court finds the most equitable rate of prejudgment interest would be 5.407%. 28 U.S.C. § 1961. Accordingly, the Court finds and awards on all damages accrued through the entry of Judgment prejudgment interest to run at 5.407%.

## II. CONCLUSIONS OF LAW

1. The Court concludes that this is a case of admiralty and maritime jurisdiction.

2. At the time of his injury on March 3, 1998, the Court concludes that James Jackson was a "seaman" as that term is legally defined under the Jones Act, and was employed by OMI.

3. The Court concludes the injuries sustained by James Jackson were proximately caused 50% by the negligence in failing to provide a safe place to work of OMI and the unseaworthiness of the M/V OMI COURIER. This negligence and unseaworthiness were each and both a legal and proximate cause of James Jackson's injuries. However, the Court further concludes that Plaintiff bears an equal 50% liability for his own legally caused losses, and that 50% of his back problems predated his stated injury..

4. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

5. For reasons set out in the Court's Findings of Fact and Conclusions of Law, hereinabove set out, and pursuant to Rule 58 of the Fed.R.Civ.P., Judgment is hereby rendered in favor of Plaintiff on his stated claims against Defendant. Therefore, Plaintiff James Jackson, shall have and recover of and from Defendant OMI COURIER TRANSPORT, INC., the total amount of $227,629.34, plus taxable costs of court and pre-judgment interest as set forth herein, and post-judgment interest at

the rate of 6% per annum, for which execution shall issue if not timely paid.

**IT IS SO ORDERED.**